```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3                         —   —   —

     UNITED STATES OF AMERICA,
 4
                Plaintiff,
 5                                        Case No. 18-20641
        v.
 6                                        Hon. Terrence G. Berg
     ANTHONY ADAMS,
 7
                Defendant.
 8   _____/

 9                          SENTENCE
                BEFORE THE HONORABLE TERRENCE G. BERG
10                  United States District Judge
               Theodore Levin United States Courthouse
11                231 West Lafayette Boulevard
                        Detroit, Michigan
12                Thursday, November 4, 2021

13
     APPEARANCES:
14
     For the Plaintiff:      Mark Chasteen
15                           U.S. Attorney's Office
                             211 W. Fort Street, Suite 2001
16                           Detroit, MI 48226
                             (313) 226-9100
17

18   For the Defendant:      Ben M. Gonek
                             Ben Gonek Law, P.C.
19                           14290 Northline Road
                             Southgate, MI 48195-1820
20                           (313) 963-3377

21

22

23

24
           To obtain a copy of this official transcript, contact:
25              Robert L. Smith, Official Court Reporter
               (313) 234-2612 • robert_smith@mied.uscourts.gov
```

1

TABLE OF CONTENTS

2

MATTER                                                    PAGE

3    SENTENCE
     Allocution by Mr. Gonek............................13
4    Allocution by Defendant Adams......................20
     Allocution by Mr. Chasteen.........................20
5    Sentence of the Court..............................24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Thursday, November 4, 2021

3    at about 10:12 a.m.

4                              —    —    —

5              (Court, Counsel and Defendant present.)

6              THE CASE MANAGER:  The Court now calls

7    Case No. 18-20641, United States of America v. Defendant II,

8    Anthony Adams.

9              Counsel, please place your appearances on the

10   record.

11             MR. CHASTEEN:  Good morning, Your Honor.

12   Mark Chasteen for the United States.

13             THE COURT:  Mr. Chasteen.

14             MR. GONEK:  Good morning, Your Honor.  Ben Gonek

15   appearing on behalf of Anthony Adams, who's seated to my

16   right.

17             THE COURT:  And good morning to you, Mr. Gonek.

18   Good morning, Mr. Adams.

19             THE DEFENDANT:  Good morning.

20             THE COURT:  All right.  Well, today is the day that

21   we have set for the sentencing in this matter, so I wanted to

22   go over a few things and make sure that Mr. Adams knew what

23   to expect.

24             So, Mr. Adams, we're going to have a hearing to

25   determine what your sentence should be here, and as part of

1    that, we will go over the presentence report that was

2    prepared, we'll make sure that you've had a chance to review

3    that with your lawyer, and if there was anything in there

4    that was incorrect, you can bring that to the Court's

5    attention and we will address that.

6            I'm also going to go over with you what the

7    different factors are that the Court must consider in

8    determining what the sentence should be, because there's a

9    federal statute that sets out these factors, it also includes

10   the sentencing guidelines.  We'll go over those sentencing

11   guidelines and make sure you understand what those are.

12           I'm also going to give your lawyer an opportunity

13   to say whatever he would like to say on your behalf.  I will

14   give you an opportunity to say what you want to say, and I

15   will listen to that.  And I will also give the government an

16   opportunity to address the Court.

17           And so after we go through all of that, then I will

18   go through all of those different factors, explain how they

19   relate to the case, and then I'll indicate what the sentence

20   will be.

21           Do you think you understand what's going to happen?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  Very good.  Let me ask about the

24   presentence report first.  Did you have a chance to review

25   the presentence report with your lawyer?

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  Okay.  Mr. Gonek, in reviewing it with

3    Mr. Adams, did you see any mistakes in there or anything that

4    you think needs to be corrected?

5    MR. GONEK:  Your Honor, I learned of one

6    minor -- one thing that needs to be corrected.  It wasn't the

7    fault of anyone.  It was after the presentence report was

8    prepared and after the time for filing of objections had

9    lapsed, Mr. Adams learned that he does have another daughter.

10   There was a paternity test done, and he has another daughter,

11   that's 11 years old.

12   THE COURT:  All right.  And so in terms of the

13   information that is in the report about his family, let's

14   make sure that it is accurate.  And so the number of children

15   that Mr. Adams has is, then, how many?

16   MR. GONEK:  Three.

17   THE COURT:  Three?

18   MR. GONEK:  Three biological children.

19   THE COURT:  Okay.  All right.  And if you could

20   provide that information to Ms. Berry, the probation officer,

21   then we can have that corrected.

22   MR. GONEK:  I will.  And just one other family

23   situation as it relates to Mr. Adams.  At the time the

24   presentence report was prepared, Mr. Adams was engaged.  That

25   engagement has broke off, and he is now engaged to a woman by

1   the name of Raven Clemons, who is present today, but I will

2   e-mail that information to Ms. Berry, as well.

3           THE COURT:  All right.  Thank you very much.  I did

4   receive a letter from Ms. Clemons and so I was aware of that.

5   Thank you for clarifying that point.  We can make sure that

6   his family information is accurate.

7           Was there anything else?

8           MR. GONEK:  In terms of the report, no, it's

9   accurate, Your Honor.

10          THE COURT:  All right.  And so do you agree with

11   that, then, Mr. Adams, with those changes that were

12   mentioned?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  And what about you, Mr. Chasteen?

15          MR. CHASTEEN:  Nothing more, Your Honor.  Thank

16   you.

17          THE COURT:  All right.  So the defendant in this

18   case, Mr. Adams, did enter a guilty plea previously.  You

19   probably remember that, Mr. Adams, on July 12th, 2019.  And

20   in that plea, you pled guilty to the charges against you

21   without any written Rule 11 plea agreement.  We often will

22   have a written plea agreement, but in your case you did not

23   have a plea agreement.  And the charges that you pled guilty

24   to were conspiracy to commit wire fraud, and that had a

25   30-year maximum penalty -- up to 30 years, and a $250,000

1    fine.

2              The second count you pled guilty to was conspiracy

3    to commit money laundering, and that had a maximum penalty of

4    up to 20 years, and a $500,000 fine, or twice the value of

5    the property involved.

6              And then you also pled guilty to a number of other

7    counts, Counts 5 through 8, that were all what we call

8    aggravated identity theft counts, and that statute requires a

9    mandatory two-year sentence that must be consecutive to any

10   other sentence.  So, in other words, it has to be added on

11   top of whatever the other sentence.

12             Now, although you've had several different

13   convictions for that, so you had Counts 5, 6, 7, 8, so you

14   had four separate convictions, we don't add those all up.  So

15   it is not two years plus two plus two -- it's just -- it has

16   to be at least two years more, so they can be concurrent with

17   each other.

18             Do you understand, you think, what your maximum

19   possible penalties would be here?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Now, the federal law also provides for

22   guidelines to apply, and so these guidelines are one of the

23   factors the Court has to consider.  They are not mandatory;

24   in other words, the Court does not have to sentence you to a

25   term within those guidelines, but they are one of the

1    factors.

2          And in this case, this summer, on July 15, 2021,

3    according to the report, you had entered into a sentencing

4    agreement that contained a calculation of those sentencing

5    guidelines.  And so I guess I'd like, just for clarity -- we

6    can have Mr. Chasteen, if you want, to indicate what those

7    guidelines are in that agreement.

8          MR. CHASTEEN:  Yes, Your Honor.  The agreement that

9    the parties entered into called for a sentencing guidelines

10   range on Counts 1 and 2 of between 97 and 121 months

11   imprisonment.  I would note, specifically, that there are

12   guidelines worksheets that were attached to that agreement,

13   and those guidelines include enhancements for a loss of more

14   than $1.5 million, 10 or more victims, sophisticated means

15   and production of counterfeit access devices in arriving at

16   the offense level calculated for the guidelines.

17         Those were previously in dispute and were going to

18   be the subject of an evidentiary, contested hearing, but

19   prior to that hearing, we came to an agreement and resolved

20   those sentencing guidelines offense characteristics by means

21   of the agreement that the Court has referred to.

22         In addition to the guidelines for Counts 1 and 2,

23   as the Court can has already indicated, there's an

24   additional 24 months, required to be consecutive to whatever

25   sentence the Court imposes on Counts 1 and 2, bringing the

1  total guidelines range to 121 to 145 months.

2      I would note the parties also agreed Mr. Adams'

3  criminal history category being a Category 3.

4      THE COURT:  All right.  Well, thank you very much

5  for that explanation, Mr. Chasteen.

6      And, Mr. Gonek, in listening to that, does that

7  reflect an accurate presentation of what the agreement was?

8      MR. GONEK:  Yes, sir.

9      THE COURT:  All right.  So the parties did enter

10 into this agreement that the guidelines to be applied are as

11 described a moment ago.  And I noted that in the presentence

12 report, the calculation that the probation officer determined

13 was the same as what the parties had determined.  In other

14 words, the guidelines range of 121 to 145 months.  Again,

15 keeping in mind, that guideline range involves the guidelines

16 for Counts 1 and 2, plus two years added on to that, so

17 Counts 1 and 2 would have a guidelines range of 97 to

18 121 months and then you have to add on the two years to each

19 end of that, and that's how you come up with the 121 to 145.

20      And so, because of the fact that I reviewed this

21 presentence report and all of the facts that are in it, and

22 those facts, I think, do support the guidelines range that

23 was reached by the parties, and that's a guidelines range

24 that has that loss amount that was mentioned, that has the

25 ten or more victims, that has sophisticated means being used,

1   and production of fraudulent devices, and that's how they

2   came up with the base offense level and the total offense

3   level of 28, and then you have a Criminal History Category 3,

4   and that's where that guidelines range comes from.

5          And so I will accept the sentencing agreement that

6   you reached with the government and I will be bound by that

7   in determining what the sentence should be.  As I said

8   before, when I say I'm bound by that, I'm bound in the sense

9   that that is the correct guideline calculation, but it is up

10  to the Court to determine what the sentence should be, and

11  the sentence could be below that if the Court believes that's

12  appropriate, but it couldn't be any higher than that, because

13  the parties have agreed, in the sentence agreement, that the

14  sentence wouldn't be any higher than that.  And so that's the

15  point I wanted to go over regarding the sentencing agreement.

16         And then I want to now go over those different

17  factors that I told you govern the Court's sentencing

18  considerations, because there's a statute called Title 18,

19  United States Code, Section 3553(a), and these are the

20  different factors I have to consider.

21         So I have to consider the nature and circumstances

22  of the offense; in other words, all the surrounding

23  circumstances and the facts of the crime and how serious it

24  is.

25         I have to consider the need for this sentence to

1   reflect the seriousness of the offense and also promote

2   respect for the law and provide for a just punishment.

3        I also need to avoid what we call unwarranted

4   sentencing disparities, and that means we need to avoid

5   sentencing people differently if their underlying crimes and

6   their backgrounds and their criminal histories are really the

7   same.

8        I also need to consider what we call deterrence,

9   and deterrence means discouraging people from committing

10  crimes.  So I need to try to impose a sentence that would be

11  sufficient to discourage others who might be considering

12  committing this kind of crime from doing so, because they

13  would see that it's a very serious crime.

14       I also need to consider the need to protect the

15  public, and also, I have to consider any special needs a

16  person might have, such as a need for drug treatment or

17  mental health treatment or any kind of addiction-related

18  treatment.  I have to consider all of those different things

19  in determining what the sentence should be.

20       So, Mr. Adams, do you understand that I do have to

21  consider all of those different things?

22       THE DEFENDANT:  Yes, sir.

23       THE COURT:  All right.  Part of this case also

24  involves restitution, because this is a case involving

25  financial fraud, where money was essentially gained through

 1  fraudulent means and misrepresentations by using counterfeit

 2  or so-called cloned credit cards, and so there was loss that

 3  was significant here.  And I think we should go over that as

 4  well, so the record is clear what that is.

 5          And so, Mr. Chasteen, given the fact that sometimes

 6  new information is gathered prior to the sentence -- in

 7  between the plea and the sentence, do you want to address the

 8  issue of restitution and how much that would be?

 9          MR. CHASTEEN:  Yes, Your Honor.  The restitution

10  amount is, I think, set forth in the PSR as well, but it's

11  also set forth in our sentencing memorandum at page 12, and

12  that is restitution of $336,000 to Walmart, and $1,603,476.80

13  to AT&T jointly -- to be paid jointly and severally with the

14  other codefendants in this case.

15          THE COURT:  All right.  Thank you very much.

16          And, Mr. Gonek, is that your understanding, too, as

17  to the restitution amount?

18          MR. GONEK:  Yes, sir.

19          THE COURT:  Okay.  Very good.

20          All right.  Well, I think we've covered the matters

21  that I need to cover in terms of making sure we are

22  consistent with what the sentencing agreement was in this

23  case and also that Mr. Adams understands the different

24  factors that I need to consider.

25          And so at this point, Mr. Gonek, I will give you

1   the opportunity to address the Court.  And I did want to also

2   make it clear that both of the attorneys in this case

3   submitted detailed sentencing memoranda to the Court, and

4   these are essentially legal briefs that are somewhat lengthy

5   and contain their arguments as to what the sentence should be

6   and references to the law and references to the facts.  And

7   in Mr. Gonek's case, they also included a number of letters

8   from supporters, family members, friends of yours, Mr. Adams.

9   And I wanted you to know that I read all of that information.

10  I read the information in the brief.  I read the letters, as

11  well as your letter, I read all of that.  And I also read the

12  government's memorandum.

13          So, Mr. Gonek, you may address the Court.  You can

14  come up to the lectern here and I will be happy to hear from

15  you.

16          MR. GONEK:  Thank you, Your Honor.

17          I just -- first of all, I want to point out there

18  was a miscommunication between Mr. Adams and myself in terms

19  of what my ultimate recommendation was in the sentencing

20  memorandum.  Fortunately, we, at the last minute, had a

21  meeting and were talking about the sentence that I would

22  recommend, and Mr. Adams -- and he's given me permission to

23  say this -- has asked that I recommend a sentence of five

24  years, and when I heard that, I believe that I did say, well,

25  there's an additional two years on top of that for the

1   aggravated identity theft, but he wanted me to request five

2   years, total.  I requested, I believe 84 months in the

3   sentencing memorandum, but I did want to bring that out to

4   the Court, initially.

5           Your Honor, I know the Court has read my sentencing

6   memorandum.  In terms of the offense itself, this was a

7   serious offense, there's no doubt about that.  I mean, it was

8   a sophisticated offense.  It went over a period of time.  It

9   happened in different states.  And everything the government

10  said about the offense is correct.  I mean, it's absolutely

11  mind boggling that Walmart would allow this to happen for the

12  length of time that they did and not suspect something based

13  on the amount of the gift cards that were purchased -- or the

14  amounts on the gift cards.  But, nonetheless, that doesn't

15  help Mr. Adams, that just refers to Walmart and how they may

16  not be the most sympathetic victim in this case, but

17  nevertheless, they are a victim, and nevertheless, this was a

18  serious offense.

19          But in looking at Mr. Adams' background, it's easy

20  to understand how he got to stand before you or how come he's

21  here today.  Mr. Adams, by all accounts, was raised by a very

22  good woman, his mother, Sabrina Adams, and she gave birth to

23  him at a young age.  She was a hard worker.  She's -- you

24  know, when I talk to her, she is always coming from work or

25  going to work, and she has a very good work ethic.  And she

1    gave Mr. Adams what he needed as a child.  Unfortunately, he

2    didn't have a father figure in the household to be there, but

3    she did the best she could, and she provided for his basic

4    needs and a loving home.  He was certainly not subject to any

5    abuse.

6          But as a young man, Mr. Adams developed what is a

7    gambling problem, and sometimes gambling problems or gambling

8    addictions can be worse than drug addictions, because with

9    drugs or alcohol, your body gives out at a certain point.

10   Unfortunately, a number of people die from those addictions,

11   but your body gives out.  With gambling, your body doesn't

12   give out.  And there's an adrenaline rush that happens and

13   you become desperate and you do desperate things.  And I have

14   even read studies where, a lot of times, gambling addicts

15   will gamble regardless of how much money that they have, just

16   for that adrenaline rush.

17         And the nature of the offense here, what was going

18   on in terms of these credit cards, I'm sure produced the same

19   type of adrenalin rush for Mr. Adams.  And Mr. Adams, as this

20   Court knows, that's one of the reasons he is detained, he has

21   had three prior contacts, as it relates to felonies involving

22   fraud-related offenses, and he's never received any real

23   punishment for those offenses.

24         He had a case in Wayne County, where he was

25   immediately given probation.  He had a case down in

1    South Carolina that involved Walmart stores, where he

2    essentially got a slap on the wrist and maybe did, like,

3    three months.  And then he had a felony case out in

4    Las Vegas, where I don't think he did, initially, much time,

5    but he ultimately did six months on a parole violation.  But

6    those were three offenses where the consequences to his life

7    were not that significant.

8         When he got arrested on this case, you taught him

9    the best life lesson by saying, unlike a lot of other fraud

10   defendants who get released on pretrial detention, you're not

11   getting out, because you just don't listen, you don't follow

12   court orders, and you've been involved in this criminality

13   and you've really never learned from it, and he was detained

14   over three years ago.

15        Now, unknown to the Court or unknown to us,

16   subsequently, thereafter, I think we went through the worse

17   time in my lifetime, of a medical pandemic, and Mr. Adams

18   sustained some real difficult pretrial conditions.

19        Initially, he was at Midland for a brief period of

20   time, where the conditions there, although it's a very clean

21   facility, he was on lockdown for about 20 hours a day.  He

22   then was at Mount Pleasant for nearly two years, where he was

23   on lockdown, essentially, all the time, and never got to go

24   outside, never got to have in-person visits with his family,

25   and it was -- and he was a long ways away from his family.

 1    And then he was transferred to Milan, at the -- during the

 2    middle of the pandemic.

 3            During that time, he acquired COVID.  As the Court

 4    knows, he does have some health conditions that made -- when

 5    he had COVID, you know, it had a severe impact on him.  He

 6    has been immunized, since recovering from COVID.

 7            And then while he was incarcerated at Milan, he

 8    had -- he wasn't -- his medications were not being

 9    administered properly, and he had a low potassium count that

10    resulted in him being hospitalized for, I think, just about

11    week.  I have attached the e-mails and the report showing the

12    hospitalization at the University of Michigan, but, you know,

13    it was -- that was a very traumatic experience for his

14    family, not knowing what happened, and also Mr. Adams not

15    being in contact or being able to tell his family what

16    happened.

17            And when we -- with the help of the government, we

18    finally figured out what was going on and they were

19    notified -- everybody was notified.  Fortunately, Mr. Adams

20    recovered, and he's back at Milan.  And he's only got to see

21    his children, in person, in the past three years, on two

22    different occasions.

23            Those conditions have been an eye-opening

24    experience for him.  Even after his initial detention, we had

25    three motions before Your Honor to revoke the order of

1   detention, and on each occasion, you rightfully said no.  And

2   that's the best thing that you probably did for

3   Mr. Adams -- I mean, you did for Mr. Adams, because after you

4   said no, he didn't say appeal to the Sixth Circuit like

5   Mr. O.D. Williams did, he just said, let's get the case

6   resolved.  I've got to deal with this, I've got to get back

7   to my family, and move on with my life and stop the childish

8   nonsense that I've been involved in -- or the nonsense that

9   I've -- or the criminality that I've been involved in.  And

10  it was a real eye-opening experience for him.

11          He has goals.  He wants to become a trucker and,

12  hopefully, own his own trucking company some day.  And even

13  though when he pled guilty, he did so without the benefit of

14  a Rule 11 plea agreement, there were extensive discussions

15  about working out the sentencing agreement that we ultimately

16  worked out.  And as the Court can recall, we worked it out on

17  the day of the evidentiary hearing, before the other two

18  defendants who were also making the same challenges or

19  similar challenges, and after Mr. Anthony Adams worked it

20  out, the other two followed suit.

21          You know, Anthony had decided the hearing is what

22  he believed a waste of time and he just wanted to get

23  sentenced and get this and start the road to rehabilitation.

24          I would ask the Court to take that into

25  consideration when it imposes sentence, because the

*Sentence • November 4, 2021*

1  conditions of pretrial confinement have been horrific on him.

2  I mean, he has endured a substantial punishment, which I

3  think weighs in favor of a more lenient sentence.

4      In terms of other needs for Mr. Adams, gambling

5  addiction, like I said, is a horrible addiction, and he would

6  certainly benefit by counseling in the Federal Bureau of

7  Prisons, maybe some behavioral cognitive therapy -- cognitive

8  behavioral therapy, I should say, and perhaps even RDAP,

9  because at one point in his life, he was addicted to

10 Percocets, as pointed out in the presentence report -- or

11 taking Percocets.

12     By all accounts, Mr. Adams has a very close

13 relationship with his family.  Even though he's had children

14 by a couple different women, he has good relationships with

15 them, because he sees the whole picture, these relationships

16 with his children.

17     This experience for him has been, like I said,

18 completely eye opening.  And I think you have taught him the

19 best life lesson that could possibly be taught about where to

20 put his priorities, and it is being back with his family and

21 taking care of his family in a law-abiding fashion.

22     As such, I would ask the Court to fashion a

23 sentence which, you know, takes into account all the factors

24 the Court considers -- or has to consider, but really looking

25 at the conditions of confinement that he has sustained for

1    the past three years -- or over the past three years.

2            Thank you.

3            THE COURT:  Thank you very much, Mr. Gonek.

4            All right.  So, Mr. Adams, I would be happy to hear

5    from you at this time.  You can come up to the lectern here

6    if you would like, and I would be happy to hear whatever you

7    would like to say.

8            THE DEFENDANT:  How you doing?  I'd just like to

9    rely on my letter that I sent you.

10           THE COURT:  Yes.  Thank you.  I did read that

11   letter carefully.  And thank you for that letter.  I thought

12   it was very thorough, and I certainly did read it, and I'm

13   considering everything you said in there.  But you are

14   perfectly welcome to say anything else that you would like to

15   say.

16           THE DEFENDANT:  No, sir.  That's all.  Thank you.

17           THE COURT:  Okay.  Thank you, sir.

18           THE DEFENDANT:  Thank you.

19           THE COURT:  You can be seated.

20           All right.  So, Mr. Chasteen, I would be happy to

21   hear from you, as well.

22           MR. CHASTEEN:  Thank you, Your Honor.

23           I know that from our prior sentencing hearings with

24   some of the other codefendants in this case, the Court is

25   very, very aware of the facts of this case and the

1    seriousness of the offense and has articulated that in prior

2    sentencings.  I'm not going to belabor that.

3            But I did want to address one comment that

4    Mr. Gonek said, and that was his expression of surprise that

5    Walmart let it go on as long as it did.  And, you know,

6    possibly Walmarts could have taken steps, generally, to

7    prevent this kind of fraud, this punching in of numbers at

8    the cashiers, but Mr. Gonek went on to say that they didn't

9    suspect what was going on, and that's just not borne out by

10   the facts of the case.  In fact, Walmart spent a considerable

11   amount of resources and time investigating this case, trying

12   to figure out who was doing this to their stores nationwide,

13   and that extensive investigation is, in fact, reflected in

14   the PowerPoint exhibit that was presented to this Court

15   previously, and cited in our memorandum connected as an

16   exhibit to court filing ECF No. 200.

17           So, you know, if the effort is to make Walmart

18   appear as though it was not doing anything to address this

19   case, I think that's just wholly inaccurate.  They, in fact,

20   really spent a tremendous amount of time with a dedicated

21   investigative team to track down who was doing this to them,

22   and ultimately, that led to, in conjunction with the FBI's

23   investigation, the charges and arrests against Mr. Adams and

24   his codefendants.  So I don't think the effort and resources

25   that Walmart put into investigating this case should be

1  minimized in any way.

2         Really, so I just would like focus on Mr. Adams,

3  himself.  And as the Court has previously found, in denying

4  Mr. Adams' prior motions for release, as referenced by

5  Mr. Gonek, Mr. Adams does pose a danger to the public as

6  borne out by his prior record, and that's what the Court

7  noted in its prior decisions, three times denying Mr. Adams'

8  request for release.

9         Mr. Gonek cites, you know, the slaps on the wrists

10  that Mr. Adams received as somehow, you know, being at fault

11  for him not taking it seriously, when he presented himself to

12  the criminal justice system.

13         I always find it odd when defense counsel argue

14  that prior, ineffective leniency is a reason for further

15  leniency.  If anything, what it shows is that exactly,

16  frankly, what happened in this case is that defendants

17  such -- or fraudsters such as Mr. Adams learned that if they

18  got caught on any individual case, the consequences were

19  likely very low, so it was a reason to keep going, keep

20  going, keep hitting store after store after store, and it was

21  very high-reward/low-risk enterprise.

22         And what this case represents is an opportunity to

23  change that calculous.  That when somebody commits widespread

24  fraud, such as Mr. Adams and his codefendants in this case,

25  there has to be a very high risk.  It's not a call for future

1  continued leniency.

2        They learned all the wrong lessons from those prior

3  slaps on the wrists, as Mr. Gonek said, and that calls for

4  this Court to impose a very serious sentence, especially when

5  you have someone who is as clearly dedicated to fraud and

6  committing crime after crime, both in prior cases and in this

7  case, as Mr. Adams is.

8        Essentially, what Mr. Adams is asking this Court to

9  do is invest in his representations to the Court that he's a

10  changed man, that he's not going to do this anymore, that

11  he's going to set whatever reasons he had for doing it aside.

12  He said there was a gambling addiction.

13        You know, we hear in the world of investing that

14  past performance is not a guarantee of future results, but it

15  is a pretty good indication.  And it is a very good

16  indication in this case, that what Mr. Adams will do it when

17  he is not under court supervision.  Even when he's been under

18  court supervision, he has continued to offend.

19        And so to protect the public from people like

20  Mr. Adams, who are committed to a lifestyle of fraud, the

21  Court needs to impose a very serious and lengthy sentence.

22  That is why the government has asked for a sentence that is

23  at least at the bottom of the guidelines range.

24        Now, we have recognized that the other defendants

25  who have been sentenced in this case, Aatif Brown,

1   Toriano Adams and O.D. Williams, received below guidelines

2   sentences, and that's really the only reason why we are

3   recommending a sentence at the bottom of the range here, just

4   to move Mr. Adams' sentence somewhat closer to the prior

5   defendants.

6           But in the government's view, there is no reason to

7   impose a sentence below the guidelines range in this case,

8   and that would send actually the wrong message that this is

9   not a serious offense, it's not as serious as Congress and

10  Sentencing Guidelines Commission have deemed it to be by the

11  guidelines that the parties have agreed on in this case.

12          Accordingly, the government does ask the Court

13  impose a sentence at least at the bottom of the guideline

14  range for Mr. Adams, which would be 97 months on Counts 1

15  and 2, plus 24 months on Counts 5 through 8.

16          Thank you.

17          THE COURT:  All right.  Thank you very much,

18  Mr. Chasteen.

19          All right.  Well, so in this matter we have

20  recommendations that are very far apart here, with the

21  recommendation that Mr. Gonek has indicated of five years,

22  which in his brief he also explained that he had said that it

23  should be really, initially he thought, seven years, because

24  five years plus the mandatory two years, but then the fact

25  that his client requested him to advocate for five years, and

1    then we have the government suggesting at the low end of the

2    guidelines range here, which would be 121 months and that's

3    ten years.  And so that's a broad range between those two

4    possible recommendations; one is double of the other.

5         And I think part of the reason that this is

6    happening is because the guidelines, here, are quite high.

7    The guidelines are very high.  To some extent, they are high

8    even without the two years added on, but they are -- they are

9    high because of the loss amount, and they are high because of

10   the number of victims, they are high because of all of the

11   other factors that make them high.

12        And so I have to consider the nature and

13   circumstances of the offense; that's the first factor.  And

14   in this case, the offense is extremely serious.  This is a

15   nationwide fraud scheme that, just in the case of Mr. Adams'

16   conduct, stretched across six different states, from

17   Oklahoma, Nebraska, Missouri, Kentucky, North Carolina and

18   Maryland, on some, really, hundreds of different

19   occasions, 35 of which were specifically mentioned in the

20   indictment, each time going into the store and buying these

21   gift cards using counterfeit credit cards.  So first the

22   scheme would involve making phony credit cards with real

23   people's names and numbers on them, and then going into the

24   Walmarts and purchasing these gift cards in large amounts;

25   each time they would go in they might get $1,500 worth, they

1    might get as many as $22,000 worth, according to the

2    presentence report.  For instance, on two separate days in

3    October 2016, $55,800 worth were purchased.

4         So the kind of fraud that it is is extremely

5    serious and extremely widespread, and so -- and then it also

6    evolved into another kind of scheme, where the defendants

7    were purchasing iPhones using stolen account information of

8    individuals who had cellphone accounts, and that they had

9    purchased a total of someone 1,495 phones and resold them.

10   That's a lot of -- that's a lot of phones, and according to

11   the report, it is as much as $1.5 million in loss from those,

12   essentially, stolen phones, phones that were purchased

13   without the real authorization of the accountholders.

14        And so there's no question that the kind of scheme

15   that this is is extremely serious.  It is very far beyond

16   what we normally see in credit card fraud cases.

17        Then it leads into the next area that I have to

18   consider, which is Mr. Adams' character and his history.

19   That history has to include if he has any criminal history.

20   Mr. Gonek pointed out that he does have several previous

21   convictions for credit card related offenses.  Both attorneys

22   have mentioned those prior convictions.  And to me, frankly,

23   they do deserve a fair amount of weight here, in considering

24   what Mr. Adams' sentence should be.  And that's because,

25   going back to 2014, when Mr. Adams was first convicted of

1   forgery credit card and debit card in Las Vegas, that offense

2   involved the defendant and some six other individuals and

3   that they had a large number of credit cards that were

4   recovered, some 19 different credit cards.  But as has been

5   pointed out, the penalty that he received or the sentence was

6   not very great; he had a sentence of 12 to 32 months that was

7   suspended, essentially, so he didn't serve any time and then

8   got a probationary sentence, so that meant no jail time.  And

9   then later he violated the probation that he had on that, so

10  he did have some penalty, but not very significant for that

11  first offense.

12          And then in 2015, again, he had a financial

13  transaction device fraud case where he was caught at the

14  airport with some 36 different cards in his boot or boots, I

15  guess, and received a six-month sentence for that.

16          And then later in that same year, he had a

17  financial transaction device forgery conviction in South

18  Carolina and received 72 days for that.  And that appears to

19  have been similar to this offense and may have been part of

20  the same offense, because one of the codefendants in this

21  case was also involved in that incident and it also involved

22  Walmart.

23          And so the concern that I have is that these kind

24  of convictions were the opportunity that Mr. Adams had to try

25  to get back on the right track, but he didn't -- he didn't do

1   so at that time.

2          There are also a number of arrests that he has,

3   which I don't give very much weight to, because they don't

4   involve any kind of finding by a jury, for instance, that

5   Mr. Adams has committed what he was arrested for.  But some

6   of these arrests are assaultive arrests, that is some what

7   concerning to the Court, and then there are two that also

8   relate to fraud.  But as I say, I can't give those very much

9   weight, but they are part of the facts that are before the

10  Court.

11          In terms of other aspects of Mr. Adams' character,

12  I do recognize that he has had a very supportive mother, a

13  hard working mother, as Mr. Gonek has pointed out, that he,

14  therefore, benefited from a stable home environment, although

15  he didn't have his father in his life.

16          He moved out of mom's home at a relatively early

17  age, at age 17, to live with his brothers, which may not have

18  been the best choice, in retrospect, because they were both

19  -- two of them were codefendants in this case.  He did not

20  have the best opportunity in terms of education, because he

21  didn't complete his high school education.  He ended up not

22  being able to complete that.  It's unclear to me whether

23  Mr. Adams has achieved his GED or not.  Mr. Gonek, I believe

24  you said he did?

25          MR. GONEK:  I believe, oh, no, I was under the

1    impression he did.  He did not.

2            THE COURT:  So he still needs to focus on his

3    education and try to make sure that he can get that degree of

4    education that will help him in terms of job opportunities

5    and kind of getting a more stable life moving forward.

6            I have read through, as I mentioned, a number of

7    the letters that were submitted and were very positive on

8    Mr. Adams' behalf from his mom, for example, Ms. Adams, wrote

9    a very positive letter.  Ms. Armstrong wrote a letter on

10   behalf of him, as well.  Ms. Clemens did, and also Mr. Adams'

11   letter itself.

12           And as I mentioned, Mr. Adams, I did read in there

13   that you feel very remorseful, that you have indicated

14   several times that you are very sorry that you got involved

15   in this offense.  You mentioned your addiction to gambling,

16   and that's in the presentence report, as well, and I think

17   that does appear to be part of what may have been motivating

18   you to be involved in this activity, this criminal activity,

19   because you were making a lot of money from this, and if you

20   had either gambling debts or just the desire to gamble, this

21   would have been a way to generate the cash that would enable

22   you to do that.

23           So I have considered all of these things about your

24   background, as well, but I also have to assess some of those

25   others factors, such as the need to provide for deterrence

| | |
|---|---|
| 1 | and also to protect the public.  To me, in this case, the |
| 2 | deterrence is important.  So deterrence, as I mentioned |
| 3 | before, is discouraging people from committing crimes.  And |
| 4 | if you have a serious crime like this, that involves |
| 5 | nationwide scope, that involves a large number of people, |
| 6 | involves over a million dollars, between 1.5 million |
| 7 | and 3.5 million, you have to have a serious sentence |
| 8 | associated with that, which will make certain that, when |
| 9 | people become aware of the kind of sentence that you received |
| 10 | for this kind of conduct, that it will discourage people from |
| 11 | committing this kind of crime and going down the road that |
| 12 | Mr. Adams has gone down in this case.  So deterrence is very |
| 13 | important here. |
| 14 | I did compare Mr. Adams' prior criminal history |
| 15 | with that of the other defendants who have been sentenced so |
| 16 | far.  All of the defendants have some prior criminal |
| 17 | histories in this case, and some of them had one or even two |
| 18 | prior criminal convictions for credit card fraud.  But |
| 19 | Mr. Anthony Adams has the most part of convictions for credit |
| 20 | card fraud, so the kind of warning that he had received was |
| 21 | greater than the others, and that's part of the consideration |
| 22 | that I have to take into account regarding the deterrence. |
| 23 | And I also have to consider -- that's why I'm |
| 24 | mentioning the other defendants, the need to avoid what we |
| 25 | call unwarranted sentencing disparities.  That means we need |

 1 │ to avoid sentencing people differently if their crimes are
 2 │ similar and their backgrounds are similar.  There is a
 3 │ database that's available from the Sentencing
 4 │ Commission -- the United States Sentencing Commission, that
 5 │ makes it possible to search and compare the offense level and
 6 │ the criminal history category the person has, with sentences
 7 │ that have been given across the country, where they search
 8 │ the last five years, and so I did that in this case.  So if
 9 │ you have an offense level of 28 and Criminal History
10 │ Category 3 and guideline range of 97 to 121 months.  The
11 │ average sentence in the last five years, according to this
12 │ database, is 104 months, and the median sentence is 97
13 │ months.  The difference between those two is averaged, just
14 │ adds up all the sentences and divides them by the numbers,
15 │ and the median takes the middle of those.
16 │         Now, there isn't a very large group here, that they
17 │ had who was in this category; there were only five, so this
18 │ is not that representative of a number of individuals to
19 │ consider it to something that should be given a lot of
20 │ weight, but I thought I would mention that, because it is
21 │ part of what I have to consider in terms of disparity.
22 │         I think, here, the comparison between the
23 │ individual defendants is probably more important.  And all of
24 │ the defendants in this case have received between 84
25 │ and 96 months, and so a sentence that is in that range would

1    be one that is consistent with the need to avoid unwarranted

2    disparities.

3              Now, I have also listened to what Mr. Gonek has

4    said about the conditions that Mr. Adams suffered while he

5    was in prison -- while he was in pretrial detention, I should

6    say.  And certainly, that is a consideration that is worth

7    thinking about, because if you're doing what you might call

8    harder time than what one might consider it to be more of a

9    punishment than if you don't have the kinds of difficulties

10   that Mr. Adams had.  But the other individuals in this case,

11   many of them have been detained as well, and so I can't give

12   too much weight to that.  And so, although I do believe that

13   a sentence that is below the guideline range here is

14   appropriate.

15             I don't think a sentence as low as what Mr. Gonek

16   is asking for is sufficient.  I have to consider each case

17   individually and try to impose a sentence that's sufficient,

18   but not greater than necessary, to accomplish all the goals

19   of sentencing.  And so in doing so, I need to consider all of

20   those different factors that I have mentioned.

21             And so in this case, part of the reason that I

22   would go below the guideline range sought by the government

23   is the inclusion of the mandatory two years here, to me, is

24   not appropriate -- I think it ends up with a sentence that is

25   far greater than what is necessary to accomplish these goals.

1  The guidelines range, without those additional two years, is

2  closer to what I think would be appropriate.

3        Considering all of these different factors, the

4  Court believes that a sentence for Mr. Anthony Adams in this

5  case, of 72 months, which would be for Counts 1 and 2,

6  followed by 24 months on the other Counts 5 through 8, would

7  be sufficient, but not greater than necessary.  So that's the

8  sentence that I intend to impose.  Before I do so, I want to

9  ask each side if they wish to place any objections on the

10  record?

11        MR. CHASTEEN:  No, Your Honor.  We made our

12  sentencing recommendation.  Obviously, we don't agree with

13  that sentence, but we have no additional comments.

14        THE COURT:  Understood.  Okay.  Mr. Gonek?

15        MR. GONEK:  I would just echo the same comments,

16  Your Honor.

17        THE COURT:  All right.  Thank you very much.

18        Pursuant to the Sentencing Reform Act of 1984, the

19  Court, considering the sentencing guidelines and factors

20  contained in 18, United States Code, 3553(a), hereby commits

21  the defendant to the Bureau of Prisons for a term

22  of 72 months custody on Counts 1 and 2, to run concurrently,

23  and 24 months on Counts 5 though 8, to run concurrently with

24  each other, but consecutively to Counts 1 and 2.

25        Upon release from imprisonment, the defendant shall

1    be placed on supervised release for a term of two years on

2    Counts 1 and 2, and one year on Counts 5 through 8, all

3    counts to run concurrently.

4          It is further ordered the defendant shall pay a

5    special assessment of $100 on each count, for a total

6    of $600, which would will be due immediately.

7          The Court waives the imposition of a fine, the cost

8    of incarceration and cost of supervision due to the

9    defendant's lack of financial resources.

10         While in custody, the defendant shall participate

11   in the inmate financial responsibility program, or IFRP.  The

12   Court is aware of the requirements of this program and

13   approves the payment schedules of this program and hereby

14   orders the defendant's compliance.

15         It is further ordered that the Court -- it is

16   further ordered that the defendant shall pay a total

17   of $1,939,475.80 in restitution, which will be joint and

18   several with the other defendants.  Restitution is payable to

19   the Clerk of Court for distribution to the victims, Walmart

20   for $336,000, and AT&T for $1,603,476.80, which will be due

21   immediately.  Interest shall not accrue.

22         Mandatory drug testing is ordered.

23         Pursuant to Title 34, United States Code, 40702,

24   the defendant shall cooperate with the collection of a DNA

25   sample as directed by the probation officer.

1          While on supervision, the defendant shall abide by

2     the standard conditions as adopted by the U.S. District Court

3     for the Eastern District of Michigan, and shall comply with

4     the following special conditions:

5          Based on the type of this instant offense and the

6     actions of the defendant, the following special conditions

7     are ordered.

8          Number one, you must participate in a cognitive

9     behavioral treatment program and follow the rules and

10    regulations of that program.  The probation officer will

11    supervise your participation in the program, in terms of its

12    provider, location, modality, duration, intensity, et cetera,

13    and such programs may include group sessions led by a

14    counselor or participation in a program administered by

15    probation office.

16         Number two, you must submit your person, property,

17    house, residence, vehicles, papers, computers, and other

18    electronic communications or data devices or media or office

19    to a search conducted by a U.S. probation officer.  Failure

20    to submit to a search may be grounds for revocation of

21    release.

22         You must warn any other occupants of any residence

23    or location where you are living that they may be subject to

24    searchs pursuant to this condition.

25         Number three, you must submit your computers or any

1    other electronic communication devices or data storage

2    devices or media to a search.

3         Because the defendant has failed to graduate from

4    high school or obtain his GED, the following special

5    condition is ordered:  Number four, you must participate in

6    an educational service program and follow the rules and

7    regulations of that program.  Such programs may include high

8    school equivalence preparation, or other classes designed to

9    improve your proficiencies and skills, such as reading,

10   writing, mathematics or computer use.

11        Based on the defendant's self-assessed gambling

12   addiction, the following special condition is ordered.

13        Number five, you must participate in a gambling

14   addiction treatment program, and follow the rules and

15   regulations of that program.  The probation officer will

16   also, again, supervise your participation in the program in

17   all the different ways that I previously mentioned.

18        Due to the defendant's past prescription pill

19   abuse, the following conditions are ordered.

20        Number six, you must submit to substance abuse

21   tasting to determine if you have used a prohibited substance.

22        Number seven, you must participate in a substance

23   abuse treatment program and follow the rules and regulations

24   of that program.  The probation officer, in consultation with

25   the treatment provider, will, again, supervise your

1    participation in this program in all the ways that I have

2    described.

3              Due to the restitution order, the following special

4    conditions are also ordered.

5              Number eight, you must pay the financial penalty in

6    accordance with the schedule payment sheet of this judgment.

7    You must also notify the Court of any changes in any economic

8    circumstance you have that might affect your ability to pay

9    this financial penalty.

10             Number nine, you must provide the probation officer

11   with access to any requested financial information and

12   authorize the release of any financial information.  The

13   probation office may share this financial information with

14   the U.S. Attorney's Office.

15             And number ten, you must not incur new credit card

16   charges or open additional lines of credit without the

17   approval of a probation officer.

18             So that is the sentence of the Court.  Is there a

19   recommendation, Mr. Gonek, with respect to the location of

20   confinement?

21             MR. GONEK:  There is, Your Honor.  Because of my

22   client's alleged strong family ties to this community, we are

23   asking the Court to recommend Milan.

24             THE COURT:  The Court does recommend that Mr. Adams

25   be allowed to serve his sentence at the federal correctional

1    institution at Milan, Michigan.  I should make it clear that

2    that decision about where a defendant is placed is ultimately

3    up to the Bureau of Prisons, rather than the Court.  However,

4    they will frequently and often take the Court's

5    recommendation in making their determination, and so I'm

6    happy to make that recommendation.

7          You also asked that he be allowed to be considered

8    for the RDAP program, which is residential drug abuse

9    treatment program.  Is that the case?

10         MR. GONEK:  Yes.

11         THE COURT:  I will make that part of judgment, that

12   I recommend that program.  It is a very good program.  It has

13   a lot of track record of success.

14         Now, Mr. Adams, you did not have a plea agreement

15   in this case, so you could appeal this sentence and

16   conviction if you wanted to -- yes, sir.

17         MR. GONEK:  Your Honor --

18         THE COURT:  Is that in the sentencing agreement?

19         MR. GONEK:  In the sentencing agreement, there was

20   a waiver of the appeal.

21         THE COURT:  I see.  Okay.  Very good.  Even though

22   there was a waiver in your sentence agreement, where you gave

23   up your right to appeal this as long as it was no greater

24   than what the agreement said, and in this case, it is not

25   greater, so you probably would not be able to appeal, even if

1    you wanted to, because you gave up your right to appeal.  If

2    you still wanted to appeal, you would need to do so

3    within 14 days of the date that the written judgment is

4    issued.  Do you understand that?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  Okay.  Very good.

7            All right.  Is there any objection that either

8    party wishes to place on the record to the sentence that was

9    rendered in open court?

10           MR. GONEK:  No, Your Honor.

11           MR. CHASTEEN:  No, Your Honor.

12           THE COURT:  Very good.  So that completes our

13   sentencing in this case.  And I would just like to say,

14   Mr. Adams, as I said, I read your letter carefully.  I

15   certainly do hope that everything that you said in there

16   is 100 percent true, and that you do want to get your life

17   turned around and really avoid any kind of criminal activity

18   going forward, and that certainly is the hope of the Court,

19   just like I know it is the hope of all the family members and

20   friends of yours who are here.  So I wish you the best of

21   luck.  We can be adjourned in this matter, if there is

22   nothing further.

23           THE CASE MANAGER:  Please rise.  Court is in

24   recess.

25           (Proceedings concluded at 11:10 a.m.)

1       —    —    —
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                                   *CERTIFICATION*

3

4              I, Robert L. Smith, Official Court Reporter of the

5    United States District Court, Eastern District of Michigan,

6    appointed pursuant to the provisions of Title 28, United

7    States Code, Section 753, do hereby certify that the

8    foregoing pages comprise a full, true and correct transcript

9    taken in the matter of UNITED STATES OF AMERICA v. ANTHONY

10   ADAMS, Case No. 18-20641, on Thursday, the 4th day of

11   November, 2021.

12

13

14                        s/ Robert L. Smith
                          Robert L. Smith, RPR, CSR 5098
15                        Federal Official Court Reporter
                          United States District Court
16                        Eastern District of Michigan

17
     Date:  05/14/2022
18   Detroit, Michigan

19

20

21

22

23

24

25